IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Appeal No. 19-14841-GG
_____

UNITED STATES,

Appellee

v.

CHRISTOPHER BRIAN COSIMANO,

Appellant
_____

A DIRECT APPEAL OF A CRIMINAL CASE
FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
DISTRICT COURT CASE NO. 8:18-cr-00234-MSS-MAP
_____

INITIAL BRIEF OF APPELLANT
_____

J. Jervis Wise, Esq.
Brunvand Wise, P.A.
615 Turner Street
Clearwater, FL 33756
Florida Bar # 0019181
Telephone: 727-446-7505
Facsimile: 727-446-8147
E-Mail: jervis@acquitter.com
CJA Counsel for Appellant Cosimano

*United States v. Cosimano, et al*

CERTIFICATE OF INTERESTED PERSONS

In compliance with Federal Rule of Appellate Procedure 26.1 and 11th Cir. Rule 26.11, the undersigned hereby certifies that the following listed persons and entities have an interest in the outcome of this particular case:

1. Adams, Natalie Hirt, Assistant United States Attorney, trial counsel for appellee;

2. Borghetti, Anne, counsel for co-appellant Mencher in the lower tribunal;

3. Brown, Jeffrey G., counsel for co-defendant Robinson;

4. Brunvand, Bjorn E., co-counsel for appellant;

5. Chapa-Lopez, Maria, United States Attorney, Middle District of Florida;

6. Cosimano, Christopher Brian, appellant;

7. Doss, D. Todd, counsel for co-defendant Wesling;

8. Flynn, The Honorable Sean P., United States Magistrate Judge;

9. Gammons, Carlton, Assistant United States Attorney, trial counsel for appellee;

10. Guinto, Allan Burt, co-defendant in the lower tribunal;

11. Hernandez, Daniel M., counsel for co-defendant Guinto;

12. Hoppmann, Karin B., Assistant United States Attorney, counsel for appellee;

13.Lykes, Charles E., Jr, former counsel for co-appellant Mencher;

14.Mencher, Michael, co-appellant;

15.McNamara, Linda Julin, Assistant United States Attorney, counsel for appellee;

16.Palmieri, Lori Doganiero, trial counsel for co-appellant Mencher;

17.Pizzo, The Honorable Mark A., United States Magistrate Judge;

18.Proctor, Gray Richard, counsel for co-defendant Guinto;

19.Rhodes, David P, Assistant United States Attorney, Chief, Appellate Division;

20.Robinson, Erick Richard, co-defendant in lower tribunal;

21.Scriven, The Honorable Mary S., United States District Court Judge;

22.Smith, Ronald Frank, counsel for co-appellant;

23.Stechschulte, Benjamin, counsel for co-defendant Guinto;

24.Wesling, Cody James, co-defendant in the lower tribunal;

25.Wise, J. Jervis, trial and appellate counsel for appellant Cosimano.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Christopher Cosimano respectfully requests oral argument on this appeal.  Counsel believes oral argument is necessary and will be beneficial to the Court in its resolution of the issues presented herein, particularly given the volume of the record from the lower court and fact-intensive nature of the issues raised herein.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ........................................................................ C1

Statement Regarding Oral Argument ..................................................................i

Table of Contents ..............................................................................................ii

Table of Citations..............................................................................................v

Statement of Jurisdiction................................................................................ ..1

Statement Regarding Adoption...................................................................... ..1

Statement of the Issues.....................................................................................2

Statement of the Case.......................................................................................3

i)     Course of Proceedings and Disposition in the Court Below ...........................3

ii)     Statement of the Facts ...............................................................................4

    A. The Local Brewing Company Altercation....................................................6

    B. Sean Leonard is Arrested and Becomes an Informant..................................7

    C. The James Costa Shooting ...........................................................................8

    D. The Paul Anderson Shooting ......................................................................9

    E. Arthur Siurano ..........................................................................................13

    F. Mr. Cosimano's Arrest and Interrogation ..................................................14

    G. The Motions to Dismiss the Section 924 Counts.........................................17

    H. The Motions to Sever ................................................................................18

I. The Motion for Judgments of Acquittal ............................................................22

iii)     Standards of Review.........................................................................................23

Summary of the Arguments .....................................................................................24

Arguments and Citations of Authority....................................................................26

I.     THE DISTRICT COURT ERRED AS A MATTER OF LAW IN
       DENYING MR. COSIMANO'S MOTION FOR JUDGMENT OF
       ACQUITTAL ON COUNTS ONE AND TWO WHEN THE
       GOVERNMENT FAILED TO PROVE SEVERAL OF THE
       NECESSARY ELEMENTS OF THE 18 U.S.C. § 1959(a)
       CHARGES......................................................................................................26

       A. The 69ers Motorcycle Club was not an Enterprise Affecting
          Interstate Commerce..............................................................................28

       B. No Evidence was Presented to Suggest that the 69ers Club was
          Engaged in Racketeering Activity..........................................................30

       C. The Evidence was Insufficient to Prove that Mr. Cosimano
          Committed or Conspired to Commit the Charged Underlying
          Offense of Florida First-Degree Premeditated Murder..........................33

       D. Mr. Cosimano Would not Have Committed the Alleged Act of
          Violence for the Purpose of Maintaining or Increasing Position in
          the Purported Enterprise ........................................................................35

II.    THE DISTRICT COURT ERRED IN DENYING MR.
       COSIMANO'S MOTION FOR JUDGMENT OF ACQUITTAL ON
       COUNT THREE BECAUSE THE ALLEGED PREDICATE
       OFFENSE OF FLORIDA FIRST-DEGREE PREMEDITATED
       MURDER DOES NOT CATEGORICALLY QUALIFY AS A
       CRIME OF VIOLENCE FOR PURPOSES OF 18 U.S.C. § 924(C) ..........37

# <u>TABLE OF CONTENTS, Continued</u>

<u>**Page**</u>

    A. The "Crime of Violence" Determination ..................................................37

    B. A Florida Offense of First-Degree Premeditated Murder Does not Qualify as a Crime of Violence Under the Categorical Approach...........41

III.   THE DISTRICT COURT ERRED IN DENYING MR. COSIMANO'S MOTION FOR SEVERANCE FROM HIS CO-DEFENDANT ................................................................................................45

    A. The Mutually Antagonistic Defenses of Mencher and Cosimano Deprived Mr. Cosimano of a Fair Trial....................................................47

    B. The Admission, in the Joint Trial, of Evidence that would not have been Admissible Against Mr. Cosimano in a Severed Trial Resulted in Undue Prejudice ....................................................................49

IV.   THE DISTRICT COURT SIMILARLY ERRED IN DENYING MR. COSIMANO'S MOTION TO SUPPRESS THE STATEMENTS MADE DURING THE CUSTODIAL INTERROGATION.....................................................................................52

Conclusion ...............................................................................................55

Certificate of Compliance with Rule 32(a)..............................................56

Certificate of Service ..............................................................................57

# <u>TABLE OF CITATIONS</u>

<u>Cases</u>                                                                                    <u>Page</u>

*Berghuis v. Thompkins*,
   560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)................................53

*Bruton v. United States*,
   391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)......................................46

*Curtis Johnson v. United States*,
   559 U.S. 133, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010)........................... 38-40, 43

*Edwards v. Arizona*,
   451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)............. 15-16, 25, 52, 54

*Fisher v. State*, 715 So. 2d 950 (Fla. 1998) ...........................................................33

*Hylor v. United States*, 896 F.3d 1219 (11th Cir. 2018)............................ 18, 39-41

*Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988) ......................................53

*Miranda v. Arizona*,  384 U.S. 436, 86 S.Ct. 1602 (1966) .............15-16, 25, 52-54

*Moran v. Burbine*,
   475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)............................... 52-53

*Neal v. State*, 854 So. 2d 666 (Fla. 2d DCA 2003).................................................33

*Penn v. State*, 825 So. 2d 456 (Fla. 2d DCA 2002).................................................33

*State of Florida v. Ruby Stephens*,
   Case 2014-CF-009880-A (Fla. 10th Jud. Cir., Polk Co.) .................................42

*United States v. Aguiar*, 610 F.2d 1296 (5th Cir. 1980)........................................47

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005) ......................................46

*United States v. Ballinger*, 395 F.3d 1218 (11th Cir. 2005).................................28

**Cases (Cont.)**                                                                      **Page**

*United States v. Baston*, 818 F.3d 651 (11th Cir. 2016)........................................28

*United States v. Beasley*, 72 F.3d 1518 (11th Cir. 1996).....................................28

*United States v. Berkowitz*, 662 F.2d 1127 (5th Cir. Unit B 1981) .....................47

*United States v. Blankenship*, 382 F. 3d 1110 (11th Cir. 2004) ...........................50

*United States v. Castaneda-Castaneda*, 729 F.2d 1360 (11th Cir. 1984) ....... 52-53

*United States v. Castillo-Valencia*, 917 F.2d 494 (11th Cir.1990).......................47

*United States v. Castleman*,
    572 U.S. 157, 134 S.Ct. 1405, 188 L.Ed.2d 426 (2014).................39-40, 42-43

*United States v. Chastain*, 198 F.3d 1338 (11th Cir. 1999)..................................23

*United States v. Chavez*, 584 F.3d 1354 (11th Cir. 2009) ....................................47

*United States v. Concepcion*, 983 F.2d 369 (2d Cir.1992) ...................................35

*United States v. Davis*,
    588 U.S. ---, 139 S. Ct. 2319, 204 L.Ed.2d 757 (2019)........................ 17-18, 38

*United States v. Deshazior*, 882 F.3d 1352 (11th Cir. 2018) ...............................40

*United States v. Dixon*, 901 F.3d 1322 (11th Cir. 2018) ......................................35

*United States v. Esle*, 743 F.2d 1465 (11th Cir. 1984) .........................................47

*United States v. Estrella*, 758 F.3d 1239 (11th Cir. 2014) ...................................39

*United States v. Farley*, 607 F.3d 1294 (11th Cir. 2010) .....................................23

*United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994)................................................35

**Cases (Cont.)**                                                  **Page**

*United States v. Garante-Vergara*, 942 F.2d 1543 (11th Cir. 1991)....................23

*United States v. Gonzalez*, 804 F.2d 691 (11th Cir. 1986) .............................. 47-48

*United States v. Green*, --- F.3d ----,
    No. 17-10346, 2020 WL 4592245 (11th Cir. Aug. 11, 2020) .........................38

*United States v. Harrell*, 635 Fed.Appx. 682 (11th Cir. 2015) ............................49

*United States v. Jones*, 906 F.3d 1325 (11th Cir. 2018)..................................18, 41

*United States v. Kim*, 307 Fed.Appx. 324 (11th Cir. 2009)..................................46

*United States v. Knowles*, 66 F.3d 1146 (11th Cir. 1995) .....................................47

*United States v. McCutcheon*, 86 F.3d 187 (11th Cir. 1996) ...............................23

*United States v. Norton*, 867 F.2d 1354 (11th Cir. 1989)....................................28

*United States v. Ontiveros*, 875 F.3d 533 (10th Cir. 2017) ..................................42

*United States v. Peeples*, 879 F.3d 282 (8th Cir. 2018)..................................42-43

*United States v. Ramos*, 798 Fed. Appx. 543 (11th Cir. 2020) ............................28

*United States v. Robertson*, 736 F.3d 1317 (11th Cir. 2013)................................35

*United States v. Sanchez*, 940 F.3d 526 (11th Cir. 2019)....................................42

*United States v. Strollar*, 10 F.3d 1574 (11th Cir.)..............................................47

*United States v. Torres*, 129 F.3d 710 (2d Cir. 1997) ..........................................28

*United States v. Tse*, 135 F.3d 200 (1st Cir. 1998)..............................................35

# TABLE OF CITATIONS, Continued

**Cases (Cont.)**                                                           **Page**

*United States v. Vail-Bailon*, 868 F.3d 1293 (11th Cir. 2017) (en banc) ..............40

*United States v. Waters*, 823 F.3d 1062 (7th Cir. 2016)........................................42

*Zafiro v. United States*,
    506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)...............................46, 51


**Statutes and Rules**

18 U.S.C. § 924 ..........................................................3, 17-18, 22, 24, 37-39, 44

18 U.S.C. § 1959 .................................................................24, 26-28, 30, 32, 35-36

18 U.S.C. § 1961 .....................................................................................................27, 30

18 U.S.C. § 3231 ............................................................................................................1

28 U.S.C. § 1291 ............................................................................................................1

11th Cir. R. 26-11 ........................................................................................................C1

11th Cir. R. 28-1 ..........................................................................................................56

Fed. R. App. P. 26.1 ....................................................................................................C1

Fed. R. App. P. 28 ..........................................................................................................1

Fed. R. App. P. 32 ........................................................................................................56

Fed. R. Crim. P. 14 ..................................................................................................45-46

Fla. Stat. § 782.04 ....................................................................................................33, 41

# STATEMENT OF JURISDICTION

Under 28 U.S.C. § 1291, the courts of appeal have jurisdiction from all final decisions of the district courts of the United States, except where a direct review may be had in the Supreme Court of the United States.

The United States District Court, Middle District of Florida, Tampa Division, had jurisdiction pursuant to 18 U.S.C. § 3231. The District Court entered its final judgment and commitment order on December 2, 2019. (Doc. 489.) Mr. Cosimano filed a timely notice on December 4, 2019. (Doc. 495.) On December 24, 2019, the district Court entered an amended judgment that imposed the same sentences previously imposed. (Doc. 515.)


# STATEMENT OF ADOPTION

Pursuant to Federal Rule of Appellate Procedure 28(i), Appellant Cosimano adopts by reference any non-adverse issues raised in the initial brief of co-appellant Michael Mencher.

## STATEMENT OF THE ISSUES

I.     Whether the District Court erred in denying the Appellant's motion for judgment of acquittal on charges of committing violent acts in furtherance of racketeering?

II.    Whether the District Court erred in denying the Appellant's motion for judgment of acquittal on a charge of use of a firearm during and in relation to a crime of violence when the alleged predicate crime of violence, Florida first-degree premeditated murder, can be committed without the use of physical force?

III.    Whether the District Court erred in denying the Appellant's motion to sever him from his co-defendant for trial when the defendants presented mutually antagonistic defenses and various evidence was presented against the co-defendant that would not have been admissible against the Appellant had the trials been severed?

IV.    Whether the District Court erred in summarily denying the Appellant's motion to suppress statements made during a custodial interrogation?

## STATEMENT OF THE CASE

### (i)    Course of Proceedings and Disposition in the Court Below

Appellant Christopher Brian Cosimano was charged in the Middle District of Florida, Tampa Division, in a second superseding indictment on charges of Conspiracy to Commit Murder in Aid of Racketeering Activity (Count 1), Murder in Aid of Racketeering Activity (Count 2), Assault with a Dangerous Weapon in Aid of Racketeering (Count 6), and Use of a Firearm During and in Relation to a Crime of Violence. (Counts 3, 4, and 7).  (Doc. 136.)  The indictment also charged co-defendants Michael Mencher, Allen Guinto, Cody Wesling, and Erick Robinson in various counts. (Doc. 136.)  Guinto, Wesling, and Robinson entered guilty pleas pursuant to plea agreements with the Government. (Doc. 221, 263, 265, 464.)

Prior to trial, Mr. Cosimano filed, among other motions, a motion to dismiss the section 924 counts for failure to state a cognizable offense, a motion to suppress his custodial statements to law enforcement, and a motion to sever his trial from that of Mencher. (Doc. 145, 159, 167, 268, 269.)  The court would deny all of those motions.  (Doc. 237, 323, 545.)

Mr. Cosimano and Mr. Mencher proceeded to a jury trial before the Honorable Mary S. Scriven that began on July 29, 2019. (Doc. 356.)  Wesling and Guinto testified as Government witnesses.  On August 12, 2019, the jury found him guilty at trial of Counts One through Four. (Doc. 381.)   The jury found him not guilty of

counts Six and Seven. (Doc. 381.) On motion of the Government, the District Court later dismissed Count Four. (Doc. 448.)

On November 20, 2019, the court sentenced Mr. Cosimano 120 months imprisonment on count one, to run concurrent with a sentence of life imprisonment on count two, and a sentence of 120 months on count three to run consecutive to the counts one and two sentences. (Doc. 475, 489, 515.) The court entered its judgment on December 2, 2019. (Doc. 489.) Mr. Cosimano filed a notice of appeal on December 4, 2019. (Doc. 495.)

**(ii)** <u>**Statement of the Facts**</u>

During the time periods at issue, Mr. Cosimano was employed full-time as a windshield repairperson. (Doc. 536:213.) He was also alleged to have been a member of the 69ers motorcycle club. (Doc. 535:116.) Co-defendant Allen Guinto, who entered into a plea agreement and testified as a Government witness, alleged that the 69ers started in New York in 1967 and that it had active clubs in New York, New Jersey, Pennsylvania, Connecticut, and Puerto Rico. (Doc. 535:125.) The members paid dues of $50 per month that were sent to the "mother chapter" in New York. (Doc. 535:136.)

Guinto testified that Mr. Cosimano was the president of the Hillsborough chapter of the club, that Sean Leonard was the vice-president, Erick Robinson was the Sergeant at Arms, and that he was the treasurer. (Doc. 535:116.) He alleged that

Mencher and Wesling had been "prospects." (Doc. 535:132.) Leonard, as discussed in more detail below, was acting as an informant for law enforcement during much of the time period at issue. (Doc. 538:57, 101.)

Members of the club were allegedly voted in by the members after serving a 12 month probationary period. (Doc. 535:110.) Guinto, however, became a member of the 69ers after having been a "probate" for only seven months. (Doc. 535:168-69.) Guinto additionally alleged that the club had a constitution that set out various by-laws. (Doc. 535:111-13.) According to Guinto, the constitution that the Government would admit into evidence had come from the Orlando clubhouse. (Doc. 535:203.) Wesling, on the other hand, testified at trial that he had never seen the constitution. (Doc. 541:66.)

Guinto admitted that the Hillsborough chapter did not always follow the rules set out in the constitution. (Doc. 535:121.) Among the rules in the constitution were that at least six members were required to start a chapter. (Doc. 535:203-04.) The purported Hillsborough club was started with only three members and never even reached six members. (Doc. 535:204.) The constitution also provided the club was to form a limited liability corporation and file yearly tax returns. (Doc. 535:204-05.) This group never did either. (Doc. 535:204-5.)

The Hillsborough club's "clubhouse" was the garage of the house where Cosimano, Robinson, and Mencher lived. (Doc. 535:135.) Guinto testified that "we

just made a bar in the shed in the back and called it a clubhouse." (Doc. 535:135.) That "clubhouse" was not created until November 2017. (Doc. 535:203, 541 at 65-66.) The clubhouse had no video surveillance system despite a clause in the "constitution" that required clubhouses to maintain a surveillance system. (Doc. 541:66.) The case agent testified at trial that Leonard, while he was working as an ATF informant, came up with the idea for the club to start a clubhouse and suggested that law enforcement might be able to wire it for surreptitious recording. (Doc. 539:37-38.)

Guinto alleged that drugs would be used at the club parties and often supplied by a member from Pennsylvania, Art Siurano. (Doc. 535:140-41.) He claimed various members dealt in small quantities of drugs. (Doc. 535:142-45.) Sean Leonard testified about one occasion when he transported heroin to help Robinson. (Doc. 538:31-32.) The only evidence of Mr. Cosimano having purportedly been involved in any alleged drug dealing, came from the testimony of Wesling, who claimed that Mr. Cosimano had him deliver a palm sized baggie of marijuana to a friend/co-worker of his on one occasion. (Doc. 541:20, 82-83.)

A. <u>The Local Brewing Company Altercation</u>

On April 18, 2017, Guinto and Leonard were at a Pinellas County restaurant and bar, the Local Brewing Company, when they were confronted by several members of the Outlaws motorcycle club, including one named Paul Anderson.

(Doc. 535:154-61; 538:50.)  Guinto would testify that Leonard wanted to "push the boundaries" by going to that restaurant where he knew Outlaws would be present. (Doc. 535:206-07.)  When the Outlaws confronted Guinto and Leonard, one of the Outlaws pointed a gun at them and told them to leave the bar and leave their motorcycle vests behind. (Doc. 535:161.)  When Guinto and Leonard declined to do so, the Outlaws attacked them, beating them to the point of unconsciousness. (Doc. 535:161-63.)  When Guinto and Leonard woke, their vests had been taken. (Doc. 535:163.)

Following the LBC incident, Mr. Cosimano was angry at Leonard for having instigated a confrontation with the Outlaws. (Doc. 535:207.)  According to Guinto, he also, however, said that he was going to take two Outlaws' vests in retribution. (Doc. 535:165-66.)   Guinto did not interpret that statement to mean that Mr. Cosimano wanted to kill any Outlaws. (Doc. 535:208.)

## B. Sean Leonard is Arrested and Becomes an Informant

Shortly after the LBC incident, Sean Leonard was arrested and charged in the Eastern District of New York on a firearms charge. (Doc. 538:7-10.)   Within approximately one week to ten days after the LBC incident, Leonard began working as an informant for law enforcement. (Doc. 538:57, 101.)  He went on to enter into a proffer agreement and to testify for the Government in the instant case. (Doc.

538:10-13.) As part of his work as an informant, Leonard made numerous controlled calls with members of the 69ers, including Mr. Cosimano. (Doc. 538:61-74.)

Leonard later testified that he had been a probate of the St. Petersburg Outlaws club. (Doc. 538:20-25.) In November 2016, however, Leonard "patched over" and joined the 69ers Orlando club. (Doc. 538:29.) He testified that he was attracted to the 69ers because, unlike the Outlaws, the 69ers did not care about territory, did not interfere with other clubs, and did not require its members to go anywhere they did not want to go. (Doc. 538:29.) Leonard claimed that he later started the Tampa club with Mr. Cosimano and Erick Robinson. (Doc. 538:30-31.) Leonard testified that all of the 69ers patches came from the "mother chapter" in Brooklyn. (Doc. 538:43.)

Leonard would claim that the national 69ers boss said, in reaction to the LBC incident, that the score would not be settled until they put two Outlaws in the hospital and had their vests. (Doc. 538:56-57.)

## C. The James Costa Shooting

On July 25, 2017, James Costa, the purported president of St. Petersburg Outlaws chapter, was shot while riding his motorcycle. (Doc. 536:104-09.) He survived the incident. (Doc. 536:104-09.) Costa would later testify that he saw both a white van and a black car near him around the time he was shot. (Doc. 536:105-09.) He did not see who shot him. (Doc. 536:107.) Allen Guinto drove a dark colored car. (Doc. 536:214.)

Guinto claimed that earlier that evening, Mr. Cosimano supposedly called him and told him that he was sitting in his work van outside of a bar in St. Petersburg where several Outlaws were present. (Doc. 535:174.) Guinto alleged that Mr. Cosimano told him that he was going to catch one of the Outlaws "slipping up" and asked Guinto to meet him later to give him an escort home. (Doc. 535:174-75.) Guinto purportedly met Mr. Cosimano later as planned, at which time Mr. Cosimano allegedly said that he shot "Jimbo." (Doc. 535:176-77.) According to Guinto, Mr. Cosimano then gave him clothes and a firearm and told him to dispose of them. (Doc. 535:177.) Guinto and Wesling claimed that they later buried the gun in a box in Wesling's yard. (Doc. 535:179; 536:234-35.) In multiple statements Wesling made prior to trial, however, he denied having known that a gun was buried in his yard. (Doc. 541:56-58.) Guinto later gave that firearm to Leonard and alleged that Mr. Cosimano had given it to him. (Doc. 535:180.)

Law enforcement later seized and searched Mr. Cosimano's white work van pursuant to a search warrant. (Doc. 536:198-218.) It found no evidence linking the van to the Costa shooting. (Doc. 536:211-13.)

### D. The Paul Anderson Shooting

On the afternoon of December 21, 2017, Guinto, Wesling, Robinson, Mencher, and Cosimano all met up at the house after having lunch. (Doc. 535:183-86.) Guinto claimed that Mr. Cosimano had allegedly told them he knew where an

Outlaw was and he wanted to follow him. (Doc. 535:184.) Wesling testified that Mr. Cosimano told him that he knew where Paul Anderson was and that he was going to go "beat the shit out of him." (Doc. 541:26.)

Sometime later, Cosimano and Mencher later left on their motorcycles. (Doc. 535:187-89.) They were wearing hoodies and helmets and were not wearing their vests. (Doc. 535:187.) Guinto testified, however, that Mr. Cosimano usually wore gloves and face covering when he rides his motorcycle. (Doc. 536:7.)

As the motorcycles left, Guinto and Robinson left with them, driving in Guinto's car. (Doc. 535:189.) Wesling drove separately in his car. (Doc. 535:189.) According to Guinto and Wesling, they, Mencher, and Robinson all had handguns with them. (Doc. 535:188.)

Guinto testified that they later came upon a truck that was believed to belong to Paul Anderson. (Doc. 535:189-90.) Wesling, on the other hand, testified that he and Guinto went out in search of the truck by themselves. (Doc. 541:32-33.) In any event, at some point later, the group began following the truck. (Doc. 535:190; 541:36.) While following the truck, the cars were in the lead and the two motorcycles were behind. (Doc. 536:12.) The group followed the truck through a toll both off of an exit of the Suncoast Parkway. (Doc. 535:191-92.)

According to Wesling, when the vehicles reached the toll booth, Anderson was stopped at a traffic signal just past the toll booth. (Doc. 541:41.) Wesling

claimed that he watched the motorcycles pass by him and pull up next to Anderson's truck, with Mr. Cosimano on the passenger side of the truck and Mencher on the drivers side. (Doc. 541:42.)  Wesling alleged that Mr. Cosimano then purportedly stood up, knocked on the truck's window, and fired multiple gunshots into the truck. (Doc. 541:43-44.)  Guinto did not see what happened, but rather, simply saw Anderson dead in his truck after pulling through the toll booth. (Doc. 535:193-94.)

Guinto claimed that everyone began following Mr. Cosimano's motorcycle after the shooting. (Doc. 535:193-94.)  Wesling, on the other hand, testified that he drove off on his own and that the motorcycles later passed him. (Doc. 541:46-47.)  Wesling testified that the bikes travelled to the east. (Doc. 541:45-46.)  Guinto claimed that the bikes travelled to the west. (Doc. 535:14.)  Guinto would further claim that, when they came to a three-way stop in a secluded area, Mr. Cosimano supposedly gave a handgun, helmets, and a sweater to Robinson and told Robinson to get rid of them. (Doc. 535:194-95.)  That night Guinto would give a handgun to Leonard during a monitored encounter. (Doc. 535:200-01; 538:75.)

An individual who had been sitting in his car directly behind Anderson's truck at the time of the shooting testified at trial to what he observed. (Doc. 541:143-65.)  He did not identify either defendant as the shooter at trial. (Doc. 541:143-65.)  He was also questioned at trial about reports of law enforcement that documented him

having said after the shooting that he did not see who fired the shots. (Doc. 541:158-59.)

Wesling alleged at trial that he met up with Mr. Cosimano a couple of hours after the shooting and that Mr. Cosimano purportedly said that he shot Anderson to protect Leonard. (Doc. 541:47-48.) Wesling admitted at trial that he had not previously told law enforcement about that alleged meeting and that he had never mentioned it to the Government until his trial preparation meetings. (Doc. 541:77-78.) Wesling admitted on cross-examination to having lied or withheld information to law enforcement numerous times. (Doc. 541:55-82.)

Government witness, Arthur Siurano, who is discussed in more detail below, claimed that Mr. Cosimano called him the morning after the Anderson shooting and asked him for help. (Doc. 537:93.) Mr. Cosimano did not, however, say that he had anything to do with the shooting of Anderson. (Doc. 537:93.)

Sean Leonard, while working as an informant, had controlled calls with Mencher and Mr. Cosimano after the shooting, several of which were admitted into evidence at trial as discussed below. (Doc. 538:76-92.)

The Government also presented at trial photographs and video from various toll booths that depicted the vehicles at issue travelling during times connected to the Costa and Anderson shootings. (Doc. 535:163-97). The Government would additionally submit footage from various surveillance cameras that showed the

motorcycles driving after the Anderson shooting. (Doc. 537:130-36.)  It also presented phone records of the various defendants to show them communicating with one another at various times during the events at issue. (Doc. 537:36-42.)

The medical examiner would testify that Anderson sustained six gunshot wounds. (Doc. 541:221.)  Of those wounds, two were inflicted on a slightly downward trajectory, two were on a slightly upward trajectory, and two were on an even trajectory. (Doc. 541:222.)  Mr. Cosimano would argue at trial that the trajectory of the shots was not consistent with him having been the shooter. (Doc. 540:48-53.)

### E. Arthur Siurano

Another Government witness, Arthur Siurano, had pending federal charges in the Eastern District of New York for controlled substance and firearms offenses. (Doc. 537:50-53.)  He had entered into a cooperation agreement with the Government. (Doc. 537:51-53.)

Siurano alleged that he joined a Brooklyn, New York 69ers club in 2014. (Doc. 537 at 57-58.)  He did not serve a probationary period, but instead, joined immediately. (Doc. 537:58.)  Siurano testified that he later started a charter in Pennsylvania and became the president of that club. (Doc. 537:59.)  He purported that he then became one of four regional bosses for the 69ers in 2016. (Doc. 537:60.)

He claimed to recognize the 69ers constitution and by-laws that the Government had submitted into evidence at trial. (Doc. 537:61-2.)

Siurano testified to having trafficked in drugs with Erick Robinson and Issac Diaz from the Orlando club. (Doc. 537:67-74.) Siurano testified to one occasion when members of Hillsborough club had travelled to New York for a party and to other occasions when he had travelled to Florida. (Doc. 537:52, 75-98.) Siurano further testified, however, that each 69ers club operated independently. (Doc. 537:99.)

### F. Mr. Cosimano's Arrest and Interrogation

Mr. Cosimano was later arrested and charged in state court for the alleged murder of Anderson. (Doc. 269:1.) Several months later, he was indicted in the District Court as discussed above.

On June 5, 2018, Mr. Cosimano was scheduled to appear at initial appearance in the District Court. (Doc. 269:1.) By that time, he had been held in state custody for the preceding six months following his arrest. (Doc. 269:2.) During a substantial portion of that time, the state's detention facility was housing Mr. Cosimano in solitary confinement, where he had very limited contact with other human beings. (Doc. 269:2.)

At approximately 11:12 A.M., the case agent initiated a custodial interrogation of Mr. Cosimano at the local ATF Office. (Doc. 269:2.)

Approximately 6:44 minutes into the interrogation, the agent began discussing Mr. Cosimano's *Miranda-Edwards* rights. (Doc. 269:2.) The agent began by telling Mr. Cosimano that they had some "like housekeeping things" to do. (Doc. 269:2.) He then stated that he had to advise Mr. Cosimano of his "rights and that stuff like that" and opined that he was sure Mr. Cosimano "wanted to talk about what's going on." (Doc. 269:2.) He went on the state that he wanted Mr. Cosimano to "put [him]self in the best possible position" and that "I'm going to give you a lot of credit and I'm going to give you a little of grace." (Doc. 269:2.) He then said "let's go over this paperwork real quick; we'll get it out of the way." (Doc. 269:2.) The agent then read *Miranda-Edwards* rights from a waiver form and asked Mr. Cosimano if he understood and agreed with the rights. (Doc. 269:2-3.) Mr. Cosimano replied that he did and signed the waiver form. (Doc. 269:3.)

The agent went on to interrogate Mr. Cosimano for approximately five hours. (Doc. 269:3-4.) During the questioning, Mr. Cosimano would get extremely emotional, crying and having difficulty speaking times. (Doc. 269:4.) Among the matters Cosimano went on to discuss were his membership in the 69ers, his relationship with the Outlaws and other motorcycle clubs, drug dealing that occurred among members of motorcycle clubs, and his relationship and difficulties with various individuals including Costa and Anderson. (Doc. 269; 384-208.) He also discussed an incident that occurred in Miami in November 2017 when he and another

individual were confronted at a South Beach restaurant by several Outlaws. (Doc. 384-208:93, 117-38.) Mr. Cosimano stated that he struck someone with a dinner plate during an altercation that ensued. (Doc. 384-208:93, 117-38.)

Mr. Cosimano later filed a motion to suppress the statements made during that interrogation on grounds that he did not knowingly, voluntarily, and intelligently waive his rights to remain silent and to be represented by counsel during any questioning. (Doc. 269.) In support of that motion, he argued that the case agent downplayed the significance of the *Miranda-Edwards* rights to the point of rendering the *Miranda-Edwards* warning meaningless. (Doc. 269.)

On June 21, 2019, the District Court orally denied the motion to suppress without an evidentiary hearing. (Doc. 323.) In making its ruling, the court provided:

> Well, it's not going to be excluded for the reason that it was involuntarily taken. That argument is without merit. So it was not involuntarily taken, it was the same sort of conditioning that law enforcement always engages in, and the defendant was well-aware of what he was signing insofar as I can tell from what was presented, so that part of the motion to suppress is denied. Now, the content of the statement itself, what the parties intend to offer up, I guess you need to confer and let the Court know. I'm reading the statement to consider this Constitutional issue, antagonistic defense issue, not for what comes in specifically.

(Doc. 544:34.) At trial, the Government would admit a transcript and recording of the interrogation with substantial redactions. (Doc. 384-208.) In the redacted transcript, references to Anderson and Costa were removed, but discussions of the

details of the 69ers club, difficulties with the Outlaws, drug activity, and the November 2017 Miami altercation remained.  (Doc. 384-208.)

## G. The Motions to Dismiss the Section 924 Counts

Prior to trial, Mr. Cosimano adopted a co-defendant's motion to dismiss the Section 924 counts on grounds that the alleged predicate act of Florida first-degree premeditated murder was not a qualifying crime of violence. (Doc. 145, 159, 167.) The District Court initially denied the motion, finding that the predicate offense qualified as a crime of violence under the residual clause. (Doc. 237.)  However, after the District Court's initial denial of the motion, the Supreme Court decided *United States v. Davis*, 588 U.S. ---, 139 S. Ct. 2319, 2323–24, 2336, 204 L.Ed.2d 757 (2019).  In light of *Davis*, the District Court readdressed the motion to dismiss at a pretrial hearing conducted on July 9, 2019. (Doc. 545.)

At that hearing, the court addressed the question of whether the predicate offense qualified as a crime of violence under the elements clause.  (Doc. 545:12-13.)  The defendants asserted that the proposed predicate offense did not qualify as a crime of violence under the categorical approach because the statute at issue could be violated without the use of physical force. (Doc. 145; 545:17-18.)  In support of that argument, the defendants proffered a scenario in which a defendant takes a boat far offshore with a victim who jumps off the boat to go swimming and the defendant

later decides to drive the boat away and leave the victim stranded in the ocean to die.

(Doc. 145; 545:17-18.)

The court went on to again deny the motion to dismiss, reasoning:

THE COURT: The Court believes that the 924(c) offenses satisfy the elements clause and therefore are not foreclosed by the Supreme Court's decision in *Davis* recently rendered. In fact, there have been two Eleventh Circuit cases construing the same language, in fact narrower language than is in 924(c), *Hylor* and *Jones*, and both found that Florida second degree murder offense is a violent felony using the same language that is required for the elements provision of 924(c), the only difference being that 924(c) also includes damage to property, not just to person, which makes 924(c) broader. But for our purposes the provision pertinent has to do with violence to the person, and under both cases the Court held that the offense must involve force that is physical, that is, it must be exerted by and through concrete bodies, and the force must be violent, meaning that the force must be capable of causing physical pain or injury to another, and in this scenario the Court considered surreptitious poisoning and found that that was sufficient force to meet the elemental provisions of 924(e), which is for our purposes identical to 924(c), and I cannot fathom that a more horrific death of drowning by deceit is any less violent than surreptitious poisoning. Moreover, the Supreme Court has made clear that the Court need not -- the Supreme Court and the Eleventh Circuit have made clear that the Court need not envision every possible hypothetical that someone can conjure up, but the only one identified here is not sufficient to overcome the force of *Hylor* and *Jones* even post the Supreme Court's decision in *Davis.*

(Doc. 545:19-20.)

## H. The Motions to Sever

Prior to trial, both Mr. Cosimano and Mr. Mencher filed motions to sever their trials. (Doc. 268, 276.) Mr. Cosimano asserted that the defendants would be raising mutually antagonistic defenses. (Doc. 268.) He further argued that he would be

unduly prejudiced by the spillover effect of evidence presented against Mencher that would not be admissible against Mr. Cosimano in a severed trial. (Doc. 268.)

The District Court first addressed the motion to sever at a June 21, 2019 hearing. (Doc. 544.)  The court discussed potential *Bruton* issues, but did not rule on the motion at that time. (Doc. 544.)  At the July 9th pretrial hearing, the Court denied the motion as motion as moot, stating that "the parties have agreed to either agree on a statement that meets the requirements of both defendants or eliminate the statement altogether, in which case there is no *Bruton* issue and there is no due process issue that prevents the case from being tried as a joint trial." (Doc. 545:36.) The court had not, however, addressed the mutually antagonistic defenses aspect of the motion to sever during the July 9th hearing. (Doc. 545.)  In addition, neither Mr. Mencher nor Mr. Cosimano withdrew their motions to sever when they reached the agreement with the Government concerning redactions to statements. (Doc. 545.)

When the case proceeded to trial, Mencher's counsel began her opening statement with the following:

> In July of 2017 Christopher Cosimano vowed and threatened to kill Paul Anderson. Law enforcement was aware of the threat and Paul Anderson was aware of the threat, and on December 21st of 2017 Christopher Cosimano made good on his threat, he shot and killed Paul Anderson in broad daylight.

(Doc. 535:97.)   Shortly thereafter, she continued attempting to implicate Mr. Cosimano, stating:

Mr. Mencher followed Mr. Cosimano that afternoon, but Mr. Mencher had no idea that Mr. Cosimano planned to kill Paul Anderson, and at the intersection of the Suncoast Parkway and State Road 54, Christopher Cosimano pulled up alongside the truck that Paul Anderson was driving, he tapped on the window and he shot and he killed Paul Anderson. Paul Anderson was his enemy.

(Doc. 535:98.) A short time later, just before concluding the opening statement, she told the jury:

Christopher Cosimano -- and you will hear this evidence through letters in the jail and different people, that Christopher Cosimano set my client up. He set him up to take the fall for the killing. His plan that he put into place was to blame it on my client, Michael Mencher.

(Doc. 535:99.)

During trial, the Government presented recordings of various controlled calls that took place between Mencher and Sean Leonard during the period when Leonard was acting as an informant. (Gov. Ex. 505-509.) In one call that occurred on November 26, 2017, Mencher discussed having been in Ft. Lauderdale, how Mr. Cosimano and "Ricky" left him behind and went to Miami, and how Mr. Cosimano got into the altercation with Outlaws on South Beach and allegedly hit one of them with a plate. (Gov. Ex. 505.) In another call that occurred in the hours after the Anderson shooting, Mencher tells Leonard that Mr. Cosimano shot Anderson and orchestrated the plan to kill him. (Doc. 384-207.)

In closing argument, Mencher's counsel again repeatedly argued that Cosimano killed Anderson and planned the shooting without Mencher's knowledge. (Doc. 540:62-70.) Mencher's counsel argued that:

> Now, at this point the history between Christopher Cosimano and Paul Anderson -- the fires were burning, the envy was burning, the jealous was burning, the hatred was mounting, and Christopher Cosimano put a plan in motion, he was going to kill Paul Anderson.
>
> When they went down to Miami, they left my client, who, remember, they call him the Village Idiot, and they call him this behind his back, they went down to Miami and he gets in a fight and he gets beaten up by these Outlaws down there. You will hear the tape -- you've heard the tape and you can listen to it again, where my client is upset that they left him out of this, "they left me behind."

(Doc. 540:63.) She continued on attempting to implicate Mr. Cosimano and exonerate Mencher throughout the closing argument, making the following arguments:

> Christopher Cosimano put this plan together and he left my client out. My client followed him, and I don't think that there's any doubt as to who shot and killed Paul Anderson that day. It was Christopher Cosimano, and he did it on his own. My client did not shoot Paul Anderson.

(Doc. 540:65.)

> He just witnessed Christopher Cosimano in broad daylight shoot and kill a man. Did he try to get rid of his motorcycle? Sure he did.

(Doc. 535:66.)

> Remember, the Village Idiot, they didn't let him in on stuff, they kept him out. Why? Because Chris Cosimano wanted him as the fall guy.

(Doc. 535:68.)

> Mr. Mencher did not pull that trigger, and Mr. Mencher did not assist or aid and abet Christopher Cosimano in doing so.

(Doc. 535:69.)

> There's been no evidence that my client knew that Cosimano had a gun prior to the shooting or that he aided and abetted.

(Doc. 535:70.)

## I. The Motion for Judgments of Acquittal

After the Government rested its case, Mr. Cosimano moved for a judgment of acquittal on all counts. (Doc. 539:42-50.)  As one of his arguments, he asserted that the Government failed to prove the existence of an enterprise that was engaged in racketeering activity and which affected interstate commerce. (Doc. 539:42-43.)  He additionally argued, as he had asserted in the motion to dismiss proceedings, that the charged predicate offenses underlying the section 924 counts did not qualify as crimes of violence. (Doc. 539:50.)

The District Court denied the motions (Doc. 539 at 59-74.)  Concerning the enterprise and commerce elements, the court stated:

> THE COURT: Well, they were running drugs up and down the East Coast. It wasn't just a drug deal in the State of Florida, it was bringing drugs from one place outside of the -- outside of Florida into Florida and selling those drugs, and of course there were the patches that were made apparently in New York and purchased from somebody who was making them and brought and put on cuts in Florida, and there was the mandatory meetings that the probates had to go to as part of their initiation which would impact, and the impact only has to be slight to

> interstate commerce, so that argument is also foreclosed by what the jury could conclude if it believed the evidence that has been offered here.

(Doc. 539:64.)

The jury went on to render its verdict and the court later imposed sentence on counts one through three as discussed above.

This appeal follows.

**(iii)**    <u>**Standards of Review**</u>

As to Issues I and II, this Court reviews *de novo* a district court's denial of a motion for judgment of acquittal based on sufficiency of the evidence. *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999); *United States v. Garante-Vergara*, 942 F.2d 1543, 1547 (11th Cir. 1991).

As to Issue III, this Court reviews the denial of a motion to sever defendants for trial under the abuse of discretion standard. *United States v. McCutcheon*, 86 F.3d 187, 189 (11th Cir. 1996).

As to Issue IV, this Court reviews the denial of a motion to suppress under a mixed standard of review. *United States v. Farley*, 607 F.3d 1294, 1325-26 (11th Cir. 2010). The trial court's legal conclusions are reviewed de novo, while its factual findings are reviewed for clear error. *Id.*

## SUMMARY OF THE ARGUMENTS

The evidence presented against Mr. Cosimano failed to establish any of the federal nexus "enterprise" elements of 18 U.S.C. § 1959. In contrast to the "enterprise" contemplated under section 1959, the 69ers club was a loosely organized group of individuals who carried out various alleged criminal acts independent of their membership in the 69ers club. The evidence thereby fell short of establishing that that the club was an enterprise affecting interstate commerce and that it was engaged in racketeering activity. Perhaps more critically, the evidence was insufficient to establish that Mr. Cosimano committed or conspired to commit the charged predicate crime of violence, Florida first-degree premeditated murder.

The District Court additionally erred in denying Mr. Cosimano's motion for a judgment of acquittal on count three when the underlying crime of violence in that section 924(c) charge was the Florida offense of first-degree premeditated murder. Because that offense can be committed without the use of physical force, the offense is not categorically a crime of violence under the elements clause of section 924.

In addition, the District Court's denial of Mr. Cosimano's motion to sever deprived him of a fair trial because the defendants presented mutually antagonistic defenses and the Government was able to admit damaging evidence in the joint trial that would not have been admissible against Mr. Cosimano in a severed trial.

Finally, the District Court erred in summarily denying Mr. Cosimano's motion to suppress the statements made during the custodial interrogation because the comments made by the agent at the time of the *Miranda-Edwards* warnings diminished the significance of those warnings to the point of rendering them meaningless, particularly in light of Mr. Cosimano's fragile emotional state at the time of the interrogation.

<u>**ARGUMENTS AND CITATIONS OF AUTHORITY**</u>

**I.**

**THE DISTRICT COURT ERRED AS A MATTER OF LAW IN DENYING MR. COSIMANO'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS ONE AND TWO WHEN THE GOVERNMENT FAILED TO PROVE SEVERAL OF THE NECESSARY ELEMENTS OF THE 18 U.S.C. § 1959(a) CHARGES.**

The evidence presented against Mr. Cosimano was insufficient to prove a) the existence of an "enterprise," b) that any purported enterprise was engaged in "racketeering activity," or c) that Cosimano committed the specifically charged underlying substantive and conspiracy offenses, and d) that Mr. Cosimano's alleged acts were committed to maintain or advance his position in the purported enterprise. The Government's evidence, therefore, fell short of proving the charges set forth in Counts One and Two of the indictment. As a result, the District Court erred in denying Mr. Cosimano's motion for judgments of acquittal.

18 U.S.C. § 1959 proscribes, in relevant part,:

> Whoever… *for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity*, murders… or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do…

18 U.S.C. § 1959. The statute goes on to define "enterprise" as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities

of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2).

Regarding the definition of the term "racketeering activity," the statute cross-references the definition set forth in 18 U.S.C. § 1961, which provides, in relevant part:

> "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year…[1]

18 U.S.C. § 1961.

Given the text of the statute, the Government bore the burden of proving, among other elements, that the 69ers club was an enterprise that took action that affected interstate or foreign commerce; that the club engaged in racketeering activity; and that Mr. Cosimano allegedly committed the purported violent acts for the purpose of maintaining or increasing position in the club. The evidence presented at trial failed to establish any of those essential elements. The elements are discussed individually below:

---

[1] The statute goes on to provide for several other specific acts that are indictable under various enumerated federal statutes. 18 U.S.C. §1961(1).

A. <u>The 69ers Motorcycle Club was not an Enterprise Affecting Interstate</u>

<u>Commerce</u>

"Section 1959 incorporates a jurisdictional element requiring a nexus between the offense in question and interstate commerce." *United States v. Torres*, 129 F.3d 710, 717 (2d Cir. 1997). In regard to the interstate commerce element of the racketeering statutes, this Court has held that the effect on interstate commerce need only be slight. *United States v. Beasley*, 72 F.3d 1518, 1526 (11th Cir. 1996). While a defendant's own individual acts need not have affected interstate commerce by themselves, the enterprise must have been engaged in or affected interstate commerce. *United States v. Ramos*, 798 Fed. Appx. 543, 547 (11th Cir. 2020) *citing United States v. Norton*, 867 F.2d 1354, 1359 (11th Cir. 1989). This Court has held that an "an entity acts 'in commerce' if it 'uses the channels or instrumentalities of interstate commerce to facilitate their commission.'" *Id. quoting United States v. Baston*, 818 F.3d 651, 664 (11th Cir. 2016). It has additionally provided that "'in commerce'" includes 'movement o[f] people or things across interstate borders.'" *Id. quoting United States v. Ballinger*, 395 F.3d 1218, 1232 (11th Cir. 2005).

Given the evidence presented at trial, the disorganized, short-lived Hillsborough 69ers club was a far cry from the "enterprise" contemplated in section 1959. The only evidence that supported any finding of the club affecting interstate commerce was evidence that some members of 69ers allegedly participated in drug

dealing, that some of them may have travelled across state lines, that the individual clubs paid purported $50 dues to the "mother chapter," and that the clubs received their 69ers patches from that mother chapter.

Concerning the purported drug activity, the evidence failed to show any nexus between the club and drug activity that various individual club members were carrying out. The fact that Robinson, Siurano, Mencher, and Issac Diaz were purported members of the 69ers had no impact on or connection to their individual drug activities. The evidence failed that the individuals dealing in drugs were utilizing their club membership to facilitate their drug activities in any discernible way. The individuals who were carrying out drug activities were simply that – individual drug dealers who also happened to be members of the 69ers.

Just the same, the one purported drug activity that Mr. Cosimano was allegedly involved in was the delivery of marijuana that Wesling claimed to have made for him. The evidence showed, however, that the recipient of that relatively small baggie of marijuana was a friend of Mr. Cosimano's who worked with him in the windshield repair business. Even assuming that the event occurred as Wesling claimed, the evidence showed that it was an independent transaction between Mr. Cosimano and a friend that had nothing to do with and no nexus to Mr. Cosimano's membership in the 69ers. Likewise, the evidence did not show that the marijuana was exchanged for anything of value so as to effect commerce.

Aside from the alleged drug dealing, whatever impact the activities of the 69ers club could have had on interstate commerce did not even reach the level of a "slight" effect. Sending dues of $50 per month to the "mother chapter," receiving patches from the "mother chapter," and members travelling at times to clubs in other states could not have had any measurable impact on interstate commerce. While very small sums of funds would have crossed state lines during the aforementioned activities, the effect on interstate commerce would have been negligible. Those minimal acts could not even be said to have had a slight effect on interstate commerce. The evidence did not, therefore, establish the existence of an "enterprise" as contemplated under section 1959.

B. No Evidence was Presented to Suggest that the 69ers Club was Engaged in Racketeering Activity

Assuming for purposes of argument that the evidence did establish the 69ers as an enterprise affecting interstate commerce, the evidence certainly did not establish that the purported enterprise engaged in racketeering activity. The Government presented no competent evidence to suggest that the group was involved in acts of racketeering as contemplated in 18 U.S.C. § 1961 -- *i.e.* acts "involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance." While individual members may have carried out crimes that would otherwise qualify as examples of

racketeering activity, the evidence failed to show any nexus between the acts of individual members and their membership in the club.

As set forth above, the evidence showed that various individual members of the 69ers were allegedly involved in drug dealing. Once again, however, the evidence did not show that membership in the 69ers facilitated the individual acts of drug dealing that were being carried out by those various club members. The evidence did not establish that the individuals involving in drug dealing used their membership position within the club to benefit their drug activities, nor that they joined the club in an attempt to do so.

Sean Leonard testified at trial that he was drawn to the 69ers because, unlike the Outlaws, the 69ers club did not care about territory, did not interfere with other clubs, and did not require its members to go anywhere they did not want to go. (Doc. 538 at 29.) Members of the 69ers were essentially free to do whatever they wanted to do. That is exactly what various 69ers members did – engage in drug dealing and other alleged criminal acts individually and independently from their membership in the 69ers. Just the same, Mr. Cosimano remained gainfully employed in the windshield repair business throughout his time as a 69ers member. Like the drug dealing being carried out by other members, Mr. Cosimano's windshield repair work operated wholly independently from his membership in the 69ers. If windshield repair work were hypothetically listed among the acts that qualify as "racketeering

activity," the evidence certainly could not have supported a finding that the 69ers, as an entity, was engaged in the windshield repair business because the evidence showed no nexus between Mr. Cosimano's windshield repair work and his 69ers membership. The same is true of the 69ers members who were allegedly engaged in drug dealing and other criminal acts on the side.

Given the evidence, the entity that was the 69ers club did not engage in any of the crimes that would fall under the "racketeering activity" definition. The group certainly existed on the fringe of society and some of its members clearly seem to have committed their share of illegal acts. Nevertheless, the Government presented no competent evidence at trial to show the entity having been involved in any of the individual acts that might constitute racketeering activity. The mere fact that individual members may have been committed crimes that would qualify under the racketeering activity does not equate to the 69ers entity being engaged in racketeering activity. The evidence simply showed no nexus between the 69ers club and the individual criminal acts of any of the members. The Government, thereby, failed to prove the "engaged in racketeering" element of 18 U.S.C. § 1959.

C. <u>The Evidence was Insufficient to Prove that Mr. Cosimano Committed or Conspired to Commit the Charged Underlying Offense of Florida First-Degree Premeditated Murder</u>

The second superseding indictment specifically charged the alleged predicate substantive and conspiracy offenses under Florida Statutes Section 782.04(1)(a)1. That subsection of the Florida statute specifically proscribes first-degree premeditated murder to the exclusion of first-degree felony murder. *See* FLA. STAT. § 782.04(1)(a). The Florida statute succinctly defines first-degree premeditated murder as "[t]he unlawful killing of a human being..[w]hen perpetrated from a premeditated design to effect the death of the person killed or any human being." FLA. STAT. § 782.04(1)(a)1. Florida courts have further held that the Florida offense of "[p]remeditated first-degree murder is a specific intent crime." *Neal v. State*, 854 So. 2d 666, 671 (Fla. 2d DCA 2003) *citing Penn v. State*, 825 So. 2d 456 (Fla. 2d DCA 2002). The Florida Supreme Court has likewise held that, "'[p]remeditation is more than a mere intent to kill: it is a fully formed purpose to kill.'" *Id.* at 670-71 *quoting Fisher v. State*, 715 So. 2d 950, 952 (Fla. 1998).

In the instant case, the evidence was insufficient to show that Mr. Cosimano committed a first-degree premeditated murder of Anderson as charged in the second superseding indictment or that he conspired with anyone else to do so. The accounts of co-defendants Guinto and Wesling were scattered and inconsistent with one

another. Wesling, moreover, admitted to having lied and withheld information throughout his attempts to cooperate with the Government. Nonetheless, neither of those witnesses testified to having had any advance idea that Anderson would be shot. Indeed no evidence, aside from mere speculation, exists to support a finding that Mr. Cosimano conspired with anyone to murder Anderson or that he ever had a premeditated design to kill Anderson. To be sure, while the alleged following of Anderson was planned, the Government presented no evidence that the shooting of Anderson was planned ahead of time. Wesling, likewise, testified that he thought the plan was to beat up Anderson, not to kill him. When the shooting did occur, it was a haphazard event that occurred in broad daylight in front of a myriad of witnesses. The only finding that the evidence supported was that the shooting was not the result of a conspiracy or a premeditated design, but rather, was a spur of the moment act that nobody expected to occur.

Notwithstanding the absence of premeditation and conspiracy, the only person who alleged to have seen Mr. Cosimano purportedly shoot Anderson was Wesling. Even the individual who was directly behind Anderson's truck did not identify Mr. Cosimano as the shooter. Moreover, the trajectory of the shots was inconsistent with Mr. Cosimano having stood over his bike to shoot as Wesling claimed. Nonetheless, even taking the evidence in a light most favorable to the Government as required under the applicable standard, the evidence was insufficient to prove as a matter of

law that Mr. Cosimano committed the charged predicate offenses of Florida first-degree *premeditated* murder or conspiracy to commit Florida first-degree *premeditated* murder.

D. <u>Mr. Cosimano Would not Have Committed the Alleged Act of Violence for the Purpose of Maintaining or Increasing Position in the Purported Enterprise</u>

Section 1959 does not define the phrase "for the purpose of ... maintaining or increasing position in an enterprise." *United States v. Robertson*, 736 F.3d 1317, 1329 (11th Cir. 2013). This Court has noted that the Second Circuit, in *United States v. Concepcion*, 983 F.2d 369 (2d Cir.1992), analyzed the relevant legislative history and concluded that "Congress intended to criminalize violent acts committed '*as an integral aspect of membership*' in a racketeering enterprise." *Robertson*, 736 F.3d at 1329 *quoting Concepcion*, 983 F.2d at 381; *also citing United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998); *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994). The Court has gone on to hold that the motive element can thereby be established with evidence "'that [the defendant] committed [the violent crime] because he knew it was expected of him by reason of his membership in [the gang] or that he committed [the violent crime] in furtherance of that membership.'" *United States v. Dixon*, 901 F.3d 1322, 1342-43 (11th Cir. 2018) *quoting Robertson*, 736 F.3d at 1330. This Court has provided that, "evidence that 'violence was a part of the group's culture,' 'that the group expected its members to ... engag[e] in violent

acts,' or that the defendant reported his actions to prove himself or 'to brag,' supports the inference that the defendant 'was motivated' by his membership." *Id.* at 1343 *quoting id* at 1331.

Mr. Cosimano as, the president of the club, would have had no reason to murder Anderson to gain entrance to or maintain or increase his position in the 69ers. Even assuming for purposes of argument that Mr. Cosimano had carried out the shooting and conspiracy to murder Anderson, the evidence failed to support a finding that the acts would have been anything more than personal acts designed to protect Mr. Cosimano himself from any further violence. To be sure, as Mr. Cosimano asserted at trial, the one person who would have had reason to commit violence against Paul Anderson to increase his position in the club would have been his co-defendant Mencher. Mr. Cosimano, on the other hand, would not have been expected to shoot Anderson by reason of his membership in the 69ers, nor would he have had reason to commit such an act in furtherance of his membership in the 69ers. Therefore, even assuming that Mr. Cosimano did commit the alleged violent act, the Government failed to prove that the acts were committed "for the purpose of maintaining or increasing position" as contemplated in 18 U.S.C. § 1959.

## II.

**THE DISTRICT COURT ERRED IN DENYING MR. COSIMANO'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT THREE BECAUSE THE ALLEGED PREDICATE OFFENSE OF FLORIDA FIRST-DEGREE PREMEDITATED MURDER DOES NOT CATEGORICALLY QUALIFY AS A CRIME OF VIOLENCE FOR PURPOSES OF 18 U.S.C. § 924(C).**

The District Court erred in denying the motions to dismiss and motion for judgment of acquittal on the Count Three charge of use of a firearm in relation to a crime of violence.  Mr. Cosimano established that the proposed predicate offense of Florida premeditated first-degree murder can be committed without the use of physical force.  As  a result, the alleged predicate offense cannot categorically qualify as a "crime of violence" as contemplated in 18 U.S.C. § 924(c).  Mr. Cosimano thereby asks this Court to reverse his Count Three conviction based on the arguments set forth below.

### A. The "Crime of Violence" Determination

Section 924(c) proscribes the use of a firearm in relation to a crime of violence or drug trafficking crime.  As this Court is well aware, a long line of cases have addressed how and whether various predicate offenses can qualify as "crimes of violence" as contemplated in section 924.

Section 924 defines the term "crime of violence" as a felony that:

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). The first of those two clauses is typically referred to as the "elements" or "force" clause and the second is referred to as the "residual clause." *United States v. Green*, --- F.3d ----, No. 17-10346, 2020 WL 4592245 at *2 (11th Cir. Aug. 11, 2020). Prior to the instant case proceeding to trial, the Supreme Court held that the residual clause is unconstitutionally vague. *United States v. Davis*, 588 U.S. ---, 139 S. Ct. 2319, 2323–24, 2336, 204 L.Ed.2d 757 (2019). The question of whether the predicate offense at issue qualifies as a "crime of violence" must therefore be determined pursuant to the elements clause. *Green*, *supra*, at * 2.

When addressing whether a certain offense qualifies as a "crime of violence" or "violent felony" under the elements clause, courts must employ what has come to be termed the "categorical approach." *Id.* Under the categorical approach, as applied to the elements clause, a court must consider the least culpable conduct that is punished under the statute at issue and determine if the statute requires the proof of the use, attempted use, or threatened use of physical force against the person of another. *Curtis Johnson v. United States*, 559 U.S. 133, 137, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010). If a conviction for the underlying offense is possible without proof of attempted, threatened, or actual use of violent force, then a conviction for the underlying offense cannot qualify as a violent felony, even if the actual offense

at issue involved the use of violent force. The categorical approach thereby "requires the government to establish, beyond a reasonable doubt and without exception, an element involving the use, attempted use, or threatened use of physical force against a person for every charge under the statute." *United States v. Estrella*, 758 F.3d 1239, 1244 (11th Cir. 2014).

While section 924 does not define "physical force," the Supreme Court has held "the phrase 'physical force' means violent force -- that is, force capable of causing physical pain or injury to another person." *Curtis Johnson*, 559 U.S. at 140. This Court has further held that, to qualify as "physical force" under section 924, the force must be: (1) "physical," in that it must be "exerted by and through concrete bodies"; (2) "violent," in that it must be "capable of causing physical pain or injury to another"; and (3) "use[d]," which requires "the knowing or intentional application of force." *Hylor v. United States*, 896 F.3d 1219, 1222 (11th Cir. 2018) (quotations omitted).

Since deciding *Curtis Johnson*, the Supreme Court addressed the use of physical force determination in a hypothetical poisoning scenario. In that case, *United States v. Castleman*, 572 U.S. 157, 134 S.Ct. 1405, 188 L.Ed.2d 426 (2014), the Court provided that:

> "use of force" in [the poisoning] example is not the act of "sprinkl[ing]" the poison; it is the act of employing poison knowingly as a device to cause physical harm. That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter. Under Castleman's

logic, after all, one could say that pulling the trigger on a gun is not a "use of force" because it is the bullet, not the trigger, that actually strikes the victim.

*Id.* at 171.

This Court has additionally, considered the question of whether the Florida offense of attempted first-degree murder qualified as a violent felony under the elements clause for purposes of the Armed Career Criminal Act. *Hylor*, *supra*, 896 F.3d 1219. In that case, the defendant presented the Court with the scenario in which a person is convicted of first-degree murder under Florida law for surreptitiously poisoning a victim. *Id.* at 1222. The defendant asserted that such an act would not involve the threatened, attempted, or actual use of physical force. This Court reasoned, however, that "[p]oisoning someone is a physical, as opposed to an 'intellectual' or 'emotional,' use of force because it involves force 'exerted by and through concrete bodies.'" *Id. citing Curtis Johnson*, 559 U.S. at 138. The Court further found "administering poison to kill someone is an intentional act that is 'capable of causing physical pain or injury.'" *Id. quoting United States v. Deshazior*, 882 F.3d 1352, 1358 (11th Cir. 2018) (quoting *United States v. Vail-Bailon*, 868 F.3d 1293, 1301 (11th Cir. 2017) (en banc)). It went on note "[t]rue, poisoning someone does not involve the "direct application of violent force," but "[t]hat the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter." *Id. quoting Castleman*, 134 S.Ct. at 1415. The Court thereby held that

attempted first-degree murder under Florida law was categorically a violent felony. *Id. see also United States v. Jones*, 906 F.3d 1325 (11th Cir. 2018) (adhering to *Hylor* and holding that the Florida offense of second-degree murder is categorically a violent felony for purposes of the ACCA).

### B. A Florida Offense of First-Degree Premeditated Murder Does not Qualify as a Crime of Violence Under the Categorical Approach

The Florida Statutes broadly define the offense of first-degree premeditated murder as "[t]he unlawful killing of a human being…[w]hen perpetrated from a premeditated design to effect the death of the person killed or any human being." FLA. STAT. § 782.04(1)(a)1. 21(1). Given that broad definition, the statute allows for the offense to be committed without the use of physical force.

As Mr. Cosimano set out at in the District Court, a defendant would commit the offense of Florida first-degree murder in the "leaving the swimmer behind" scenario. In that scenario, the defendant and the victim take a boat several miles offshore. While offshore, the victim jumps in the water and goes for a swim. While the victim is in the water, the defendant develops a premeditated intent to drive the boat away and leave the swimmer behind, knowing that the swimmer would surely drown before he could ever reach land. In that scenario, the defendant commits the offense with passive inaction that does not involve the use of force of any kind. At no point in that scenario is force "exerted by and through concrete bodies."

Another scenario in which the Florida first-degree murder statute can be violated without the use of physical force is the intentional starvation of an infant. That factual scenario led to a first-degree murder conviction in at least one Florida case, *State of Florida v. Ruby Stephens*, Case 2014-CF-009880-A (Fla. 10th Jud. Cir., Polk Co.). As heinous as the starvation of an infant is, it simply does not involve the use of physical force. In the intentional starvation scenario, no force is exerted through a concrete body. On the contrary, it is actually the *omission* of a type of force – the feeding of the child – that results in the offense.

Mr. Cosimano recognizes that this Court has found that the fact that a state murder offense can be committed by the starvation of a child does not exclude the offense as a crime of violence. *United States v. Sanchez*, 940 F.3d 526, 535 (11th Cir. 2019). In reaching that holding, the Court relied on *Castleman* and reasoned that it was joining "three other circuits that have concluded, based on *Castleman*, that intentionally withholding food or medicine with the intent to cause bodily injury or death constitutes a use of force under the elements clause." *Id.* at 536 *citing United States v. Waters*, 823 F.3d 1062, 1064, 1066 (7th Cir. 2016); *United States v. Ontiveros*, 875 F.3d 533, 538 (10th Cir. 2017); *United States v. Peeples*, 879 F.3d 282, 287 (8th Cir. 2018). The Court further provided that it was endorsing the reasoning employed by the Eighth Circuit in *United States v. Peeples*, where it stated:

In the example of a care-giver refusing to feed a dependent, it is the act of withholding food with the intent to cause the dependent to starve to death that constitutes the use of force. It does not matter that the harm occurs indirectly as a result of malnutrition. Because it is impossible to cause bodily injury without force, it would also be impossible to cause death without force.

*Id. quoting Peeples*, 879 F.3d at 287.

Under the Eighth Circuit's reasoning in *Peeples*, every offense that results in death would necessarily be a crime of violence. Mr. Cosimano respectfully submits that reaching such a conclusion would require an overbroad employment of the categorical approach. Indeed, concluding that any offense that results in death necessarily involves the use of physical force would nullify the use of the categorically approach in any case involving death. Had the Supreme Court intended for the categorical approach to have such a sweeping effect, it would have likely reached that conclusion in *Castleman*, if not also in *Curtis Johnson*.

In the poisoning scenario at issue in *Castleman*, the Court found that the administration of poison was an indirect form of force. *Castleman*, 572 U.S. at 171. The administration of the poison is a force because it involves the intentional introduction of a foreign substance into the victim's body – *i.e.* the exertion of a force by and through a concrete body, however slight that force may be. The poisoning and abandoning a swimmer on the high sea examples, on the other hand, involve no such indirect force. On the contrary, it is the omission of any force that results in murder in those situations. As set forth above, while intentional starvation

would require an intent to cause the victim's body to shut itself down, it simply does not involve the exertion of force "by and through concrete bodies."

Given Florida law's broad view of the conduct that can encompass first-degree premeditated murder, the offense can be committed without the use of physical force.  As a result, when analyzed under the categorical approach, the Florida statute is overbroad, for purposes of section 924, in its failure to require that the least culpable conduct proscribed under the statute include intent to use or threaten to use "physical force against the person of another."  For that reason, the proposed predicate offense charged in Count Three was not a qualifying "crime of violence" under section 924(c).  The District Court, consequently, erred in denying Mr. Cosimano's motion for a judgment of acquittal on that count.

**III.**

## THE DISTRICT COURT ERRED IN DENYING MR. COSIMANO'S MOTION FOR SEVERANCE FROM HIS CO-DEFENDANT

In addition to the error in denying the motions for judgments of acquittal, the District Court also erred in denying Mr. Cosimano's pretrial motion for severance. Mr. Cosimano suffered clear prejudice when he was tried in a joint trial with co-defendant Mencher. As Mr. Cosimano warned would occur, he and Mencher presented mutually antagonistic defenses in which Mencher implicated Mr. Cosimano at every opportunity that he could. Furthermore, because he was tried alongside Mencher, the Government was able to present evidence against Mencher that would have otherwise been inadmissible against Mr. Cosimano in a severed trial. Most significantly, the Government presented recordings of controlled calls Mencher made to Sean Leonard in which Mencher implicated Mr. Cosimano as the shooter and planner of the Anderson shooting. At least one other of the calls additionally supported Mencher's claim that Mr. Cosimano planned for him to "take the fall" for the Anderson shooting. For those reasons, the denial of the motion to sever deprived Mr. Cosimano of a fair trial.

Rule 14 of the Federal Rule of Criminal Procedure states in relevant part:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).  The Supreme Court has found that the Rules pertaining to joinder and severance "are designed 'to promote economy and efficiency and to avoid a multiplicity of trials, [*so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial*.'" *Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) *quoting Bruton v. United States*, 391 U.S. 123, 131 n.6, 88 S.Ct. 1620, 1625 n.6, 20 L.Ed.2d 476 (1968) (emphasis added).   "When ruling on a severance motion, a district court should 'balance the right of the defendant to a fair trial against the public's interest in efficient and economic administration of justice.'" *United States v. Kim*, 307 Fed.Appx. 324, 327 (11th Cir. 2009) *quoting United States v. Baker*, 432 F.3d 1189, 1236 (11th Cir. 2005). The district court should grant the motion to sever "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

This Court has recognized "four types of prejudicial joinder that can require a severance under Rule 14:

(1) Where the Defendants rely upon mutually antagonistic defenses.

(2) Where one Defendant would exculpate the moving Defendant in a separate trial, but will not testify in a joint setting.

(3) Where inculpatory evidence will be admitted against one Defendant that is not admissible against the other.

(4) Where a cumulative and prejudicial 'spill over' effect may prevent the jury from sifting through the evidence to make an individualized determination as to each Defendant.

*United States v. Chavez*, 584 F.3d 1354, 1360-61 (11th Cir. 2009) (citations omitted); *see also United States v. Aguiar*, 610 F.2d 1296, 1302 (5th Cir. 1980) (holding "[a] trial court has a duty to sever the trials of co-defendants with mutually antagonistic defenses to preserve their rights to a fair trial.").

    A. The Mutually Antagonistic Defenses of Mencher and Cosimano Deprived

Mr. Cosimano of a Fair Trial

      With respect to mutually antagonistic defenses, this Court has further held that "to compel severance, the defenses of co-defendants must be more than merely antagonistic, they 'must be antagonistic to the point of being mutually exclusive.'" *United States v. Knowles*, 66 F.3d 1146, 1159 (11th Cir. 1995) *quoting United States v. Castillo-Valencia*, 917 F.2d 494, 498 (11th Cir.1990) (*citing United States v. Berkowitz*, 662 F.2d 1127, 1133 (5th Cir. Unit B 1981)). Defenses are antagonistic to the point of being mutually exclusive if "'the jury, in order to believe the core of testimony offered on behalf of [one] defendant must necessarily disbelieve the testimony offered on behalf of his codefendant.'" *Id. quoting United States v. Strollar*, 10 F.3d 1574, 1578 (11th Cir.), *cert. denied*, 512 U.S. 1211, 114 S.Ct. 2688, 129 L.Ed.2d 820 (1994) (*quoting United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984) (per curiam)). In one such case, *United States v. Gonzalez*, 804 F.2d 691

(11th Cir. 1986), this Court found that a defendant had been prejudiced by a joint trial with a co-defendant when the court found that the defendants' defenses "were irreconcilable and mutually exclusive" where "[one defendant] incriminated [the other defendant] at every opportunity." *Gonzalez*, 804 F.2d at 695.

As in *Gonzalez*, Mencher and Cosimano implicated each other at every opportunity they had. Furthermore, to believe one defendant's defense, the jury would have necessarily had to disbelieve the other defendant's. Mencher specifically alleged that Mr. Cosimano planned the shooting of Anderson without Mencher's knowledge, committed the shooting of Mencher, and then planned to frame Mencher as a scapegoat. Mr. Cosimano was, thereby, left to defend against both the Government and his sole co-defendant. The prejudice to Mr. Cosimano was, furthermore, compounded by Mr. Cosimano's order in the indictment. Given that Mr. Cosimano was charged higher in the indictment, he was called on to conduct his opening statement, cross-examinations, and closing arguments prior to Mencher. He, thereby, had no opportunity to rebut Mencher's counsel, particularly after her opening and closing statements. During both the opening and closing arguments, Mencher emphatically argued that he was innocent because Mr. Cosimano purportedly planned the shooting without his knowledge and then sought to frame Mencher. Mr. Cosimano asserted, on the contrary, that the shooting of Anderson was a rogue and unplanned act of Mencher's. In the end, Mr. Cosimano arguably

had a more difficult task in defending against Mencher's allegations than he did in defending against the Government's allegations.

As the Statement of the Facts illustrate above, Mencher's counsel literally and figuratively "pointed the finger" at Mr. Cosimano on every opportunity she could. Most critically, she spent a substantial portion of her closing argument doing so. Because, however, she delivered that argument after Mr. Cosimano, Mr. Cosimano was left without an available means to defend against his co-defendant. Under the circumstances, the failure to sever the defendants deprived Mr. Cosimano of his right to a fair trial by jury.

B. <u>The Admission, in the Joint Trial, of Evidence that would not have been Admissible Against Mr. Cosimano in a Severed Trial Resulted in Undue Prejudice</u>

Aside from the mutually antagonistic defenses, Mr. Cosimano also suffered undue prejudice from the spillover effect of evidence that was admissible only against Mencher. While "the mere fact that there might be an 'enormous disparity in the evidence admissible against [one defendant] compared to the other defendants is not a sufficient basis for reversal,'" […] "[s]everance is mandated by the district court where compelling evidence not admissible against one or more codefendants will be introduced against another codefendant." *United States v. Harrell*, 635

Fed.Appx. 682, 687 (11th Cir. 2015) *quoting United States v. Blankenship*, 382 F. 3d 1110, 1123 (11th Cir. 2004).

Had the trials been severed, Mencher's recorded statements to Leonard would not have been admissible in Mr. Cosimano's trial. Mencher's recorded statements to Leonard were admissible against Mencher as statements of a party opponent. *See* FED. R. EVID. 801. Because Mencher's statements were made to a confidential informant and were not statements that would have been in furtherance of the alleged conspiracy, the recorded statements would not have been admissible as co-conspirator admissions against Mr. Cosimano. *Id.* In the most critical of those statements, one of the calls with Leonard after the Anderson shooting, Mencher directly implicated Mr. Cosimano as the shooter as well as the alleged orchestrator of the scheme. Similarly, in the call where Mencher discussed being "left behind" when Mr. Cosimano went to Miami, Mencher supplied a purported motive for Mr. Cosimano to commit the Anderson shooting as retaliation for or protection from personal attacks from the Outlaws. Just the same, Mencher was able to argue that that call was an example of Mr. Cosimano allegedly cutting him out of the loop and purportedly intending to frame him for the soon to follow Anderson shooting. But for the defendants having been tried jointly, the Government would not have been able to admit Mencher's recorded calls with Leonard against Mr. Cosimano. Given

the significance of those recordings in the totality of the evidence, the admission of Mencher's statements further deprived Mr. Cosimano of a fair trial.

Based on the unique facts and circumstances of this case, the joinder of Mr. Cosimano and Mr. Mencher resulted in undue prejudice to the defendants that outweighed the interests of the public and the Government in conducting a joint trial. Given the mutually exclusive nature of the defendants' defenses, the *Zafiro* curative instruction that the District Court gave to the jury was insufficient to cure the prejudice that inured to Mr. Cosimano in the joint trial. *See Zafiro*, 506 U.S. at 539, (noting that limiting instructions "often will suffice to cure any risk of prejudice"). As a result, Mr. Cosimano asks this Court to find that he suffered prejudice as result of the District Court's denial of his motion for severance.

## IV.

**THE DISTRICT COURT SIMILARLY ERRED IN DENYING MR. COSIMANO'S MOTION TO SUPPRESS THE STATEMENTS MADE DURING THE CUSTODIAL INTERROGATION.**

The interrogation of Mr. Cosimano clearly took place in a custodial setting and, thereby, implicated the holdings of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966) and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). As such, any statements made during such a custodial interrogation cannot be admitted against a defendant at trial unless the defendant was aware of and understood his right against self-incrimination and his right to counsel at the time of the questioning. *Id.* In addition, assuming that the defendant did understand the rights in question, his statements still cannot be admitted against him unless those statements were made voluntarily and pursuant to a valid *Miranda-Edwards* waiver. *Id.*; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362 (11th Cir. 1984). When a defendant allegedly makes statements following a waiver of those rights, the waiver, furthermore, "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

When a defendant objects to the admission of post-*Miranda* custodial statements, the Government bears the burden of proving that the defendant knowingly and voluntarily waived his rights prior to making the statements.

*Berghuis v. Thompkins*, 560 U.S. 370, 382, 130 S.Ct. 2250, 176 L.Ed.2d 1098

(2010). In such a scenario, the defendant is entitled to a hearing and an independent

determination as to the voluntary nature of the statement. *Miller v. Dugger*, 838 F.2d

1530, 1536 (11th Cir. 1988). "The waiver inquiry 'has two distinct dimensions':

waiver must be 'voluntary in the sense that it was the product of a free and deliberate

choice rather than intimidation, coercion, or deception,' and 'made with a full

awareness of both the nature of the right being abandoned and the consequences of

the decision to abandon it.'" *Thompkins*, 560 U.S. at 382-83 *quoting Moran*, 475

U.S. at 421. The voluntariness of the waiver and the subsequent statement then turns

on a totality of the circumstances analysis. *Moran*, 475 U.S. at 421; *Castaneda-

Castaneda*, 729 F.2d at 1362. The totality of the circumstances generally vary on a

case-by-case basis and must, therefore, be assessed in light of the specific facts of

the case. *Castaneda-Castaneda*, 729 F.2d at 1362. "Only if the 'totality of the

circumstances surrounding the interrogation' reveals both an uncoerced choice and

the requisite level of comprehension may a court properly conclude that the *Miranda*

rights have been waived." *Moran*, 475 U.S. at 421 *quoting Fare v. Michael C.*, 442

U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

The totality of the circumstances in the instant case clearly demonstrate that

Mr. Cosimano made the custodial statements to law enforcement without knowingly

and voluntarily waiving his rights. The case agent quite clearly minimized and

downplayed the significance of Mr. Cosimano's *Miranda-Edwards* rights to the point of rendering the advisement of rights a nullity. At the time of the interrogation, Mr. Cosimano was, moreover, suffering the adverse psychological effects of having been housed in solitary confinement for a substantial period of time leading up to the interrogation. Given that fact, coupled with Mr. Cosimano's limited education and intelligence, Mr. Cosimano's purported waiver of his *Miranda-Edwards* rights was not knowing and voluntary.

The District Court, consequently, erred in summarily denying Mr. Cosimano's motion to suppress the statements he made during the custodial interrogation. While much of the statement was redacted when admitted at trial, the Government was able to use the portions that remained to attempt to prove the enterprise and racketeering elements of the counts one and two charges and to provide a purported motive for Mr. Cosimano to purportedly want Anderson dead. The denial of the motion to suppress therefore prejudiced Mr. Cosimano and further deprived him of a fair trial.

## CONCLUSION

Based on the foregoing, Appellant Christopher Brian Cosimano respectfully requests that this Honorable Court reverse the judgment and sentence imposed in this cause and remand the case to the district court with instructions to enter a judgment of acquittal or, in the alternative, with instructions to conduct a new trial.

Respectfully Submitted,

s/ *J. Jervis Wise*
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant Cosimano

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned certifies, pursuant to 11th Circuit Rule 28-1, that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure because it contains 12,536 words, excluding the parts exempted by subsection 32(a)(7)(B)(iii). Microsoft Word software was used to count the words in the foregoing Brief. This Brief, likewise, complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

*s/ J. Jervis Wise*

J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone: 727-446-7505
Facsimile: 727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant Cosimano

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, on August 31, 2020.

s/ *J. Jervis Wise*
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone: 727-446-7505
Facsimile: 727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant Cosimano

I FURTHER CERTIFY that seven hard copies of the foregoing brief are being furnished to the Clerk of this Court by mail.

s/ *J. Jervis Wise*
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone: 727-446-7505
Facsimile: 727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant Cosimano